ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**HYUNSEOUNG CHOI**

*Plaintiff,*

-v-

**KINGSDALE PARTNERS LP,**
**KINGSDALE SHAREHOLDER SERVICES US INC.,**
**PETROTEQ ENERGY INC.,**
**UNIEXPRESS INVESTMENT HOLDING PLC,**
**VISTON UNITED SWISS AG,**
**2869889 ONTARIO INC.,**
**ROBERT DENNEWALD,**
**MICHAEL HOPKINSON,**
**REINHARD PAUL,**
**VLADIMIR PODLIPSKIY,**
**ZBIGNIEW ROCH,** and
**GURKAN VURAL**

*Defendants.*

Case # 26-cv-6618-JRC

Cho, MJ

**COMPLAINT**

JURY TRIAL DEMANDED

RECEIVED
OCT 22 2026
PRO SE OFFICE

Plaintiff Hyunseoung Choi alleges the following based on personal knowledge and on public filings, corporate records, historical prices, and reporting concerning the defendants.

**NATURE OF THE ACTION**

1. This case concerns a €450 million insurance policy that the insurer says it never issued.

2. In July 2022, Viston United Swiss AG and its acquisition subsidiary filed the document with the Securities and Exchange Commission ("SEC") to support the financing of their CAD $0.74/share cash tender offer for Petroteq Energy Inc.

3. ERGO, the German insurer named in the document, has reportedly stated that it is a forgery and has filed a criminal complaint.

REC'D IN PRO SE OFFICE
OCT 22 '26 AM11:16

4. Unbeknownst to Plaintiff, this policy was merely one of several false financing documents presented with this offer.

5. The €420 million loan that Viston called unconditional came from UNIExpress Investment Holding PLC, a London company that filed dormant-company accounts for every year in which it made or confirmed that commitment.

6. An earlier €120 million proof of funds bore a signature reportedly copied from an unrelated Toronto lawyer. The owner of the Swedish company that Viston said had acted as its agent reportedly said that his company's name had been misused.

7. Petroteq's board recommended that shareholders accept the offer. It did so while disclosing that it could not verify the source of the funds and that public information raised questions about UNIExpress's access to them.

8. Petroteq then republished UNIExpress's own confirmation that the cash was blocked for the offer and certified that release after due inquiry. It continued to endorse the financing after its own counsel questioned the insurance document.

9. Petroteq's own diligence into the proof of funds was still open when the offer collapsed.

10. On August 22, 2022, the Committee on Foreign Investment in the United States ("CFIUS") rejected the parties' joint notice. The offer was withdrawn a week later without the purchase of a single share, and Petroteq's share price fell 83.9%.

11. In 2024, the Treasury Department announced the maximum available penalty against a party to an abandoned transaction whose rejected notice contained forged documents and signatures concerning the source of its funding.

12. Plaintiff bought Petroteq shares in reliance on these financing representations and lost most of his investment.

13. Plaintiff brings this action under the Securities Exchange Act of 1934 (the "Exchange Act") and common law against the parties who made the false financing assurances and those who endorsed and disseminated them. He asserts negligence and fiduciary claims in the alternative.

## PARTIES

14. Plaintiff Hyunseoung Choi currently resides and has resided in Queens County, New York at all relevant times.

15. Between January 6 and August 19, 2022, Plaintiff purchased 425,827 Petroteq common shares in the United States under the symbol PQEFF for $118,328.91.

### The Viston Defendants

16. Defendant 2869889 Ontario Inc. (the "Offeror") is an Ontario, Canada corporation which made the tender offer and is a wholly owned subsidiary of Viston United Swiss AG.

17. Defendant Viston United Swiss AG ("Viston") is a company organized in Switzerland and the Offeror's ultimate parent.

18. Defendant Zbigniew Roch ("Roch") was Viston's president and the Offeror's chief executive officer and sole director. Upon information and belief, Roch is a German citizen residing in Oedheim, Germany.

19. Defendant Reinhard Paul ("Paul") was the Offeror's chief financial officer. Upon information and belief, Paul is a German citizen residing in Bürglen, Switzerland.

20. The Offeror, Viston, Roch, and Paul are referred to jointly as the "**Viston Defendants**."

### The UNIExpress Defendants

21. Defendant UNIExpress Investment Holding PLC ("UNIExpress") is a public limited company organized under the laws of the United Kingdom.

22. UNIExpress was the purported lender providing the necessary financing for the deal.

23. UNIExpress's purported banking operations were a sham used to supply fabricated financial support for the offer, as detailed below.

24. Defendant Gurkan Vural ("Vural"), also identified as Gürkan Vural, was identified in UNIExpress's financing instruments as its manager or director. Upon information and belief, Vural is a British and/or Turkish citizen residing in the United Kingdom.

25. UNIExpress and Vural are referred to jointly as the "**UNIExpress Defendants**."

**<u>The Petroteq Defendants</u>**

26. Defendant Petroteq Energy Inc. ("Petroteq") is an Ontario, Canada corporation developing oil-sands extraction technology, with operations in Utah. During the offer, its stated principal executive office was in California.

27. Defendant Vladimir Podlipskiy ("Podlipskiy") was a Petroteq director and later its interim chief executive officer. Upon information and belief, Podlipskiy resides in California.

28. Defendant Michael Hopkinson ("Hopkinson") was Petroteq's chief financial officer and a director from January 24, 2022. Upon information and belief, Hopkinson resides in Canada.

29. Defendant Robert Dennewald ("Dennewald") was a Petroteq director and Audit Committee member. Upon information and belief, Dennewald resides in Luxembourg.

30. Petroteq, Podlipskiy, Hopkinson, and Dennewald are referred to jointly as the "**Petroteq Defendants**."

**<u>The Kingsdale Defendants</u>**

31. Defendant Kingsdale Partners LP ("Kingsdale LP") is an Ontario, Canada limited partnership with a stated address at 130 King Street West, Suite 2950, Toronto. It served as information agent and depositary for the offer under the Kingsdale Advisors name.

32. Defendant Kingsdale Shareholder Services US Inc. ("Kingsdale US") is the United States Kingsdale entity. On information and belief, it provided shareholder solicitation services for the offer with Kingsdale LP under the Kingsdale Advisors name.

33. Kingsdale LP and Kingsdale US are referred to joinly as the "**Kingsdale Defendants**."

## JURISDICTION AND VENUE

34. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and Exchange Act § 27, 15 U.S.C. § 78aa, over the claims arising under the Exchange Act. The Court has supplemental jurisdiction over the related state-law claims under 28 U.S.C. § 1367.

35. During the offer, Petroteq's common shares were listed on the TSX Venture Exchange ("TSXV") as PQE and quoted on the United States OTC market as PQEFF. These markets concerned the same class of common shares.

36. Plaintiff purchased only PQEFF through United States brokerage accounts, in United States dollars, and held the shares in those accounts. His purchases concerned the U.S. OTC market.

37. The Offeror and Viston solicited United States shareholders through their SEC-filed offer, website, shareholder campaign, and tender procedures for holders using United States intermediaries and the Depository Trust Company ("DTC").

38. Although the offer price was stated in Canadian dollars, shareholders could elect payment in United States dollars by checking a box in the Letter of Transmittal.

39. Plaintiff's claims arise from the financing representations used to induce his purchases on the United States OTC market.

40. Roch and Paul adopted the Offeror's financing disclosures for its offer to United States shareholders. UNIExpress supplied financing representations for the tender filings, and Vural executed the June and July 2022 amendments to Viston's loan agreement with UNIExpress.

41. Petroteq maintained its principal executive office in California, operated in Utah, and published its recommendation and financing disclosures to investors, including United States holders. Podlipskiy, Hopkinson, and Dennewald adopted the respective disclosures identified in the factual allegations through their signatures or certifications.

42. Kingsdale LP and, on information and belief, Kingsdale US participated in soliciting United States holders through the offer website and shareholder campaign. Plaintiff submitted his information through that website while in New York and received a Kingsdale representative's responsive email in New York.

43. This Court has personal jurisdiction under Exchange Act § 27 based on each defendant's own participation in the United States offer and disclosures alleged here.

44. Alternatively, as to any foreign defendant not subject to jurisdiction in any individual state's courts of general jurisdiction, Plaintiff invokes Rule 4(k)(2) based on that defendant's contacts with the United States as a whole.

45. Venue is proper under 15 U.S.C. § 78aa(a) and 28 U.S.C. § 1391(b)(2) because Plaintiff received and relied on the challenged materials and placed the resulting orders in this district.

46. The offer campaign used interstate communications to reach shareholders, including Plaintiff, in connection with those transactions.

## FACTUAL ALLEGATIONS

### April - August 2021: The purported Uppgard offer and proof of funds

47. On April 16, 2021, a purchase offer for Petroteq was published in the German Federal Gazette in the name of Uppgard Konsult AB ("Uppgard"). In July 2021, financing evidence circulated in Uppgard's name purporting to confirm €120 million in funds for the offer.

48. Viston's identity was not then public. In its October 25, 2021 Offer Circular, Viston stated that it had engaged Uppgard as its agent in initiating the earlier purchase offer.

49. Viston further stated that it had supplied Uppgard with a €120 million SWIFT confirmation and authorized its distribution to interested parties. The document purported to demonstrate funding for the acquisition.

50. Counsel acting on behalf of Viston reportedly supplied the purported proof of funds to Petroteq's counsel on August 24, 2021, with Viston's identity redacted. The stated purpose was to demonstrate Viston's financial bona fides.

51. Petroteq acknowledged receipt in an August 30, 2021 news release reproduced in its Form 8-K. It stated that the then-unknown Uppgard client had supplied a €120 million SWIFT confirmation through Canadian counsel in response to Petroteq's request for proof of funds before negotiating a confidentiality agreement.

52. The purported Uppgard agency relationship and the earlier financing evidence were fabricated, as shown by the owner's reported denial and the copied signature described below.

**October 2021 - January 2022: The tender offer and financing assurances**

53. On October 25, 2021, the Offeror and Viston filed a Schedule TO (the "**Tender Offer Statement**") with the SEC, offering CAD $0.74 for each Petroteq common share tendered and accepted. The offer included an explicit notice to U.S. shareholders and an entire section dedicated to U.S. federal income tax considerations.

54. The Offer to Purchase and Circular dated October 25, 2021 (the "**Offer Circular**"), filed as Exhibit (a)(1)(i) to the Tender Offer Statement, set out the offer's terms and financing.

55. The Offer Circular described UNIExpress's €420 million commitment as firm, stating: "The Term Loan is unconditional and may be borrowed in full at any time."

56. On behalf of the Offeror, Roch, as CEO and sole director, and Paul, as CFO, certified that the Offer Circular had no "untrue statement of a material fact and does not omit to state a material fact that is required to be stated or that is necessary to make a statement not misleading in the light of the circumstances in which it was made." Roch made the same certification for Viston as its sole director and president.

57. The Long-Term Debt Financing Agreement dated October 22, 2021 (the "**Viston Loan Agreement**"), filed as Exhibit (b)(1) to the Tender Offer Statement, was identified as the source of funds for the acquisition.

58. It identified UNIExpress as lender, Viston as borrower, and Roch as personal guarantor. Roch signed this agreement as guarantor and on behalf of Viston. Vural signed for UNIExpress.

59. The Offeror also published financing answers on PetroteqOffer.com. Website materials filed as Exhibits (a)(5)(ii) and (a)(5)(iii) to the Offeror's October 25 Tender Offer Statement and October 27 Tender Offer Statement, respectively, linked shareholders to the offer documents, Kingsdale contacts, and a form requesting holdings and tender status.

60. These Exhibits repeated that Viston had a firm €420 million commitment and that the offer had no financing condition.

61. On January 10, 2022, the Offeror filed to the Tender Offer Statement a shareholder call-flow script and email templates (the "**Shareholder Outreach Material**"), as Exhibits (g)(1) and (a)(5)(v), respectively. The Shareholder Outreach Material promoted the fully financed cash offer and €420 million commitment as reasons to tender, and identified Kingsdale as the caller and disseminator of this information. Plaintiff read the Shareholder Outreach Material through the SEC's website within a month of filing.

62. Roch signed that filing for both the Offeror and Viston.

63. The Offer Circular originally set February 7, 2022 as the deadline for acceptance and reserved the Offeror's right to seek voluntary review by CFIUS, the U.S. interagency committee that reviews certain foreign investments for national-security risks.

64. The Offeror subsequently reported that it submitted a voluntary declaration on January 6, 2022, beginning the CFIUS process that proceeded during the extensions described below.

65. Vural, who signed the Viston Loan Agreement for UNIExpress, is also a purported signatory of the earlier €120 million confirmation.

66. Viston's formal offer continued the use of fabricated financial support to present the acquisition funding as genuine and available.

**<u>November 2021 - January 2022: Petroteq recommends acceptance</u>**

67. On November 6, 2021, Petroteq issued a directors' circular, filed as Exhibit (a)(1)(A) to its Schedule 14D-9 ("**Petroteq Recommendation Statement**"), describing unanswered requests about Viston's principals, experience, and funding. Podlipskiy signed the circular's certificate on behalf of Petroteq's Board as a director.

68. The Board instructed shareholders not to tender at that time and to withdraw any shares already tendered. It deferred its decision whether to recommend acceptance or rejection pending an internal review.

69. In its supplement dated December 29, 2021 (the "**Recommendation Supplement**"), filed January 4, 2022 to the Petroteq Recommendation Statement, Petroteq changed its position and unanimously recommended that shareholders accept the offer and tender their shares.

70. Podlipskiy signed the Board's certificate on the Recommendation Supplement.

71. The supplement also stated that Petroteq's directors and executive officers intended to accept the offer and tender their own shares.

72. The Board recommended acceptance while its own questions about the financing remained open, as alleged below.

**February 2022: Further assurances concerning available acquisition funds**

73. By its First Notice of Variation and Extension dated February 1, 2022, the Offeror extended the offer deadline from February 7 to February 28 while regulatory review was ongoing.

74. In its February 10, 2022 news release, filed as Exhibit (a)(5)(C) to the Petroteq Recommendation Statement (the "**Feb 10 Petroteq News Release**"), Petroteq reported receiving from Viston's Canadian counsel a Royal Bank of Scotland advice dated February 7, 2022 (the "**Purported RBS Bank Advice**"). In the SEC filing, Podlipskiy certified the statement as true "after due inquiry."

75. Petroteq said the Purported RBS Bank Advice confirmed that UNIExpress, acting for Viston, held €420 million in cash, "irrevocably blocked" and reserved for 45 days in favor of the receiving bank's client, Kingsdale.

76. The February announcement went beyond the earlier representation that UNIExpress had committed to provide a loan. It represented that UNIExpress already held €420 million in cash and that those funds were irrevocably reserved for the transaction.

77. That assurance followed Petroteq's disclosed inability to verify UNIExpress's access to funding. By publishing the asserted cash reservation, Petroteq made a more specific representation about the financial resources supporting its recommendation.

78. Viston and the Offeror repeated the representations regarding the Purported RBS Bank Advice in their Second Notice of Extension dated February 24, 2022, filed as Exhibit (a)(1)(viii) to the Offeror's Tender Offer Statement (the "Second Extension Notice"). Section 2(c) stated that

Viston's counsel had supplied the advice at the Viston's request after Petroteq's counsel sought further information.

79. Roch and Paul signed the Offeror's certificate covering the Second Extension Notice together with the Offer Circular. Roch also signed Viston's certificate covering those documents.

80. The Second Extension Notice extended the offer again, to April 14, 2022, to allow additional time to obtain CFIUS clearance. It reported that CFIUS could not grant clearance on the initial "declaration" after its assessment and that the Offeror would file a fuller voluntary "notice."

81. The February assurances repeated the false representations concerning available acquisition funding.

**January - August 2022: Kingsdale's role in the offer**

82. The Offer Circular identified Kingsdale as both information agent and depositary, with responsibilities for shareholder assistance, receipt of tenders, and payment transmission. Shareholders were directed to Kingsdale for information and copies of the filed offer documents.

83. Kingsdale was also the named beneficiary of the cash that UNIExpress claimed to hold, as alleged above.

84. The January Shareholder Outreach Material identified the senders of the material to be Kingsdale Advisors. The answering machine script encouraging shareholders to tender their shares identifies the caller as Kingsdale Advisors.

85. Upon information and belief, Kingsdale operated the website PetroteqOffer.com to display offer materials and collect shareholders' holdings and tender status. All contact information displayed on the website directed shareholders to Kingsdale.

86. Kingsdale also served as the media contact on Viston's July 22, 2022 announcement concerning the Purported ERGO Policy.

87. Viston's Second Extension Notice also attributed information correcting Petroteq's reported capitalization to Kingsdale.

88. Kingsdale LP participated in the offer campaign by operating the website and the shareholder solicitation. On information and belief, it approved the financing content communicated to shareholders.

89. On information and belief, Kingsdale US participated in operating those channels and approving and disseminating that content to United States holders, including Plaintiff.

**April - July 2022: Further extension and CFIUS review**

90. By its Third Notice of Extension dated April 14, the Offeror extended the offer to June 17, expressly to allow additional time for CFIUS clearance.

91. The Offeror and Petroteq formally submitted the "joint voluntary notice" to CFIUS on May 16, 2022.

92. The U.S. Department of the Treasury ("Treasury") notified them on May 24 that CFIUS had accepted the notice for review and that its 45-day review period had begun, with completion expected by July 7.

93. By its Fourth Notice of Variation and Extension dated June 17, 2022, the Offeror extended the offer to July 22.

94. On July 5, 2022, Petroteq entered a letter agreement regarding corporate management with Viston and the Offeror, filed July 6 as Exhibit (d)(2) to the Tender Offer Statement. Podlipskiy signed for Petroteq.

95. The agreement expressly sought to confirm Petroteq's continuing support for the offer and provided for cooperation toward its completion.

96. The agreement further preserved the Board's "unconditional right" to change its recommendation "at any time in its sole discretion," automatically terminating the agreement upon public announcement of that change.

97. Petroteq thus committed itself to support the offer while keeping the right to withdraw that support at any time. It continued to support the offer until after CFIUS rejected the notice.

**July - August 2022: The Purported ERGO Policy and revised financing disclosures**

98. On July 6, 2022, the Offeror filed a "Second Amending Agreement" dated June 29, 2022, amending the Viston Loan Agreement, as Exhibit (b)(3) to its Tender Offer Statement (the "**Original Second Amendment**" to the Viston Loan Agreement).

99. Roch signed for Viston and himself, while Vural signed for UNIExpress.

100. The amendment represented that a surety bond had been put in place to replace Roch's stated personal guarantee.

101. The attached document (the "**Purported ERGO Policy**"), purportedly issued by German insurer ERGO, named Viston as policyholder and stated €450 million of coverage payable to UNIExpress.

102. The Purported ERGO Policy was not a genuine insurer document, as alleged below.

103. On July 7, 2022, Treasury notified the Offeror and Petroteq that CFIUS would undertake an investigation of the transaction, to be completed no later than August 22.

104. On July 22, 2022, Viston and the Offeror issued their Fifth Notice of Extension, filed as Exhibit (a)(1)(xi) to the Tender Offer Statement (the "**Fifth Extension Notice**"). Roch and Paul signed the Offeror's certificate covering the notice together with the Offer Circular. Roch also signed Viston's certificate covering those documents.

105. An amendment dated July 21, 2022, filed as Exhibit (b)(4) to the July 22 Tender Offer Statement, increased the purported loan commitment to €465 million.

106. The "Amended and Restated Second Amending Agreement," also dated July 21, 2022 and filed as Exhibit (b)(5) to that filing (the "**Restated Second Amendment**" to the Viston Loan Agreement), replaced the Original Second Amendment and changed the recital to an agreement to arrange insurance in the future.

107. The Fifth Extension Notice disclosed that Petroteq's counsel had raised questions on July 19. It acknowledged that no executed insurance certificate had been issued and that issuance and premium payment were expected at drawdown.

108. The notice nevertheless stated that Viston had been advised that the Purported ERGO Policy was provided by UNIExpress's insurer to UNIExpress.

109. ERGO has reportedly denied issuing the document. These representations were materially false or misleading when made.

110. On August 1, 2022, Petroteq furnished to the SEC its Management's Discussion and Analysis dated July 29, 2022 (the "**July MD&A**") and interim financial statements for the period ended May 31, 2022 (the "**July Financial Statements**").

111. The July MD&A and the July Financial Statements described the Purported RBS Bank Advice and repeated the Viston confirmation that €465 million was available. The July MD&A repeated the Board's reasons for recommending the offer, including "certainty of value and immediate liquidity." The July Financial Statements contained the parallel recommendation and financing discussion.

112. Podlipskiy and Hopkinson certified their review of the interim financial report and MD&A in their respective certifications dated July 29, 2022 (the "CEO Certification" and "CFO

Certification"). Each certified that, based on his knowledge, having exercised reasonable diligence, the reports contained no material misrepresentation.

113. Petroteq thus continued to present the cash offer as an alternative to the risks of its stand-alone business while reporting financing supported by the purported insurance arrangement.

114. The July disclosures were misleading because they left investors with the impression that the Purported ERGO Policy came from a genuine insurer relationship. Disclosure of a future certificate and unpaid premium did not disclose that ERGO had not issued the Purported ERGO Policy or entered that relationship, as reported below.

115. Those financing representations supplied a factual basis for the tender recommendation.

116. Furthermore, an archived capture of the Kingsdale-run PetroteqOffer.com shows that the website continued to display the following assurance at least through August 16, 2022:

117. "Fully Financed Cash Offer. The Offer is not subject to a financing condition. The Offeror intends to fund the Offer from cash resources available to Viston, who has secured, on a firm, committed basis, up to EUR 420 million to fund the consideration payable for the Common Shares and to complete the transaction."

118. The displayed assurance postdated the July 19 questions and the July 22 financing revisions. It was materially misleading for the reasons described above.

**<u>August 2022: CFIUS rejection and withdrawal</u>**

119. On August 22, 2022, Treasury notified the Offeror and Petroteq that CFIUS had "rejected" their joint voluntary notice.

120. Viston and the Offeror publicly announced the rejection on August 24, and Petroteq followed on August 25.

121. The Offeror subsequently terminated the offer on August 28 and announced withdrawal on August 29 without purchasing shares. The rejection was among the developments cited in the withdrawal announcement.

**The purported financing was fabricated**

122. *Heilbronner Stimme* is a regional German newspaper based in Heilbronn, Baden-Württemberg, Germany. The articles on its website, Stimme.de, are written entirely in German, and cannot be accessed without payment.

123. Unbeknownst to Plaintiff, in August and November 2022, *Heilbronner Stimme* published a series of articles in the German language concerning the Petroteq offer.

124. Public records and later reporting contradict the financing representations described above. The evidence is set out below for each representation.

*The Uppgard agency representation*

125. The Offer Circular stated that Viston had engaged Uppgard as its agent for the April 2021 purchase offer and had supplied Uppgard with the €120 million SWIFT confirmation.

126. An August 17, 2022 article reported that the true owner of Uppgard Konsult AB, Roger Uppgard, said he did not have any knowledge about the Petroteq offer attributed to his company, and that someone had misused his company's name.

127. Mr. Uppgard said that American authorities had already contacted him about the matter.

128. On November 29, 2022, *Heilbronner Stimme* also reported that the Federal Gazette had confirmed it does not check notices before publishing them.

129. Viston's statement that it engaged Uppgard cannot be reconciled with Roger Uppgard's statement that his company's name was misused. On information and belief, Viston's statement was false.

*The €120 million proof of funds*

130. *Heilbronner Stimme's* November 29, 2022 reporting described the earlier €120 million confirmation as a UNIExpress document bearing signatures attributed to Vural and "Michael Goetz." It reported that the Goetz signature was copied from a Toronto lawyer named Michael Lacy, who told the newspaper he had no involvement.

131. A redacted copy of a letter dated July 19, 2021 bears UNIExpress's name and the heading "PROOF OF FUNDS." It purports to confirm that a client held €120 million in cash and that UNIExpress held the funds on the client's instructions.

132. The copy displays signatures attributed to "Michael Goetz" and "Gurkan Vural," each described as a senior independent director of UNIExpress Bank.

133. On information and belief, the July 19, 2021 letter is the UNIExpress document identified in the November 29 reporting.

134. The letter formed part of the financing evidence circulated for the purported Uppgard offer and is distinct from the February 2022 Purported RBS Bank Advice.

135. The November 29 article also reported that other purported bank guarantees and insurance documents were found on UNIExpress servers.

136. These documents reportedly used copied signatures of singer Adam Lambert and German local politician Nico Marquardt.

137. Mr. Marquardt reportedly denied any knowledge of UNIExpress.

138. The reported documents bearing copied signatures connect UNIExpress's business to the production of purported bank guarantees and other financial assurances.

*The UNIExpress commitment*

139. The filing history maintained by Companies House, the United Kingdom's registrar of companies, describes UNIExpress's accounts for the years ending January 31 of 2021, 2022, and 2023 as dormant-company accounts.

140. This period includes every financing commitment and confirmation attributed to UNIExpress in connection with the offer, from the July 19, 2021 proof-of-funds letter through the July 2022 amendments.

141. A company is "dormant" for Companies House purposes when it has no significant accounting transactions during the year.

142. UNIExpress has also been linked to forged financial documents in Turkey. On August 17, 2022, Heilbronner Stimme reported on real-estate fraud in Turkey centered on "Uniexpress Bank," which was reportedly registered for a time at a dentist's office in Istanbul.

143. According to those reports, guarantees presented as issued by the large German insurer Hannover Re were forged. The July 19, 2021 proof-of-funds letter likewise describes its signatories as directors of "UNIExpress Bank."

144. On November 29, 2022, Heilbronner Stimme reported that at least ten people had been arrested in Turkey on suspicion of real-estate fraud carried out through shell companies using forged insurance documents and bank guarantees.

145. The article cited reports that people responsible for Uniexpress Bank was involved in the alleged criminal organization, and a prosecution witness described the network as operating from Turkey through England to Germany.

146. On information and belief, based on the facts above, UNIExpress operated a sham bank whose business included manufacturing and supplying fictitious financial documents.

147. UNIExpress lacked the genuine financial backing represented for the Petroteq offer and used its corporate identity to manufacture apparent institutional proof of funds and financing commitments.

*The Purported RBS Bank Advice*

148. The confirmation that the funds were blocked came from UNIExpress itself.

149. The stated 45-day reservation ended on or about March 24, 2022.

150. The Purported RBS Bank Advice is dated February 7, 2022, within UNIExpress's dormant year ending January 31, 2023. On information and belief, a company holding €420 million in cash on a client's behalf would have had significant accounting transactions in that year.

151. The offer materials continued to present the financing as available through August 2022, as alleged above.

*The Purported ERGO Policy*

152. On August 17, 2022, Heilbronner Stimme reported that an ERGO spokesperson denied issuing the Purported ERGO Policy or entering the stated contractual relationship. The reporting also stated that ERGO had filed a criminal complaint and notified the SEC.

153. On August 18, 2022, the Heilbronn public prosecutor's office announced that it had reopened proceedings because newly emerged information gave rise to an initial suspicion of criminal conduct.

154. Heilbronner Stimme reported on August 26, 2022 that those proceedings were directed against Roch. Further reporting said that CFIUS had suspicions about the Purported ERGO Policy, and that CFIUS contacted ERGO for verification.

155. On November 29, Heilbronner Stimme reported that the Stuttgart public prosecutor's office (which has a white-collar crime division) had taken over the investigation concerning the Purported ERGO Policy.

156. The Purported ERGO Policy, as filed with the SEC, also contains features inconsistent with a genuine insurer document.

157. Each page states that the document was issued on June 23, 2022. It states a term of insurance ending June 23, **2032**, while its attachment states that the insurance period is one year and one day.

158. It gives the address of the German insurance ombudsman as "PO Box 080632, 0006 Berlin." German postal codes have five digits.

159. It lists UNIExpress's SWIFT code as BUKBGB22XXX, which is in reality assigned to Barclays Bank UK.

**Petroteq endorsed the financing over its own unresolved doubts**

160. Petroteq was the shareholders' gatekeeper. As the target, it was required by SEC Rule 14e-2 to state whether it recommended the offer and why. Its recommendation was the only assessment of Viston's financing issued by a party that did not act for Viston.

161. Petroteq identified the central weakness in the financing in December 2021: it could not verify that UNIExpress had the money.

162. It then endorsed the financing for eight months while, by its own account, that weakness remained unresolved.

163. In December 2021, Petroteq's counsel contacted Viston's counsel several times about Viston's control persons and the source of the funds for the offer.

164. A review of public information about UNIExpress had raised questions about whether UNIExpress had access to the funding required for the loan. The Board requested information about UNIExpress's identity and the ultimate source of the funds.

165. The Board remained unable to verify, from independent or public sources, who would provide funding to UNIExpress. Neither Petroteq nor its advisors had conducted formal due diligence on Viston, and the Board's evaluation rested solely on public information.

166. The same document stated that the Board had "no reason to doubt" Viston's statements concerning the loan and the source of its funds.

167. On February 8, 2022, Companies House recorded UNIExpress's dormant-company accounts for the year ending January 31, 2021 and published a first Gazette notice for its compulsory strike-off. Two days later, Petroteq published the Purported RBS Bank Advice, reporting that UNIExpress held €420 million in cash for Viston. Podlipskiy certified that filing after due inquiry, as alleged above.

168. On June 22, 2022, Petroteq stated that it continued to support the offer and to cooperate fully with Viston in moving the offer to completion. It also stated that it intended to involve Viston in its search for a new chief executive officer.

169. On July 19, 2022, Petroteq's counsel raised questions about the Original Second Amendment and the Purported ERGO Policy. Viston's July 22, 2022 announcement described those questions as concerning the effective date of the amendment and the insurance bond.

170. Ten days after those questions, Petroteq issued the July MD&A and July Financial Statements, and Podlipskiy and Hopkinson signed the CEO Certification and CFO Certification. Those reports repeated the financing representations, as alleged above. The aforementioned features of the Purported ERGO Policy appeared on the face of the document filed on July 6, 2022.

171. On August 25, 2022, Petroteq stated that its due diligence into "various components of the 'proof of funds'" submitted by Viston and the Offeror was continuing. On information and belief, the questions Petroteq identified in December 2021 remained unresolved throughout the period in which it recommended the offer.

172. Petroteq and the individual Petroteq Defendants continued to endorse the financing while those questions remained unresolved.

**<u>What CFIUS found</u>**

173. CFIUS's 2024 Annual Report explains (emphasis added):

> "CFIUS may reject a notice due to incompleteness, a material change to the transaction, **discovery of contradictory information regarding the transaction**, or failure of the parties to respond to the Committee's requests for follow up information."

174. In its annual reports, CFIUS reported rejecting one notice in 2022, two in 2023, and one in 2024. On information and belief, the single rejection CFIUS reported for 2022 was its rejection of the Petroteq notice on August 22, 2022.

175. CFIUS filings (which can be "declarations" or "notices") which indicate a potential threat to national security on the merits are usually withdrawn during review, or, in rare circumstances, face a "Presidential Decision."

176. Under 50 U.S.C. § 4565(c), information filed with CFIUS generally are exempt from disclosure under the Freedom of Information Act, subject to limited exceptions, including when information is relevant to a judicial proceeding.

177. In 2024, Treasury reported on its CFIUS Enforcement webpage that CFIUS had imposed a $1.25 million penalty, "the maximum amount authorized under the applicable CFIUS regulations," against a transaction party for "submitting a joint voluntary notice ('JVN') and

supplemental information containing five material misstatements, including forged documents and signatures."

178. A subsequent CFIUS investigation found that the "foreign acquirer had made material misstatements in the JVN regarding the source of funding for the transaction and related agreements, as well as subsequent material misstatements during CFIUS's review."

179. CFIUS states it "rejected the filing as a result of the misstatements, and the transaction was abandoned."

180. Each element of Treasury's description matches the Petroteq offer.

181. Treasury described a joint voluntary notice. The Offeror and Petroteq submitted a joint voluntary notice to CFIUS on May 16, 2022.

182. Treasury described misstatements in the notice and further misstatements during CFIUS's review. CFIUS accepted the Petroteq notice for review on May 24, 2022. The Purported ERGO Policy was filed with the SEC on July 6, 2022, while that review was under way. On information and belief, the parties also submitted it to CFIUS.

183. Treasury described misstatements regarding the source of funding for the transaction and related agreements. The disclosed source of funding for the Petroteq offer was UNIExpress, under the Viston Loan Agreement and its amendments.

184. Treasury described forged documents and signatures. ERGO has reportedly stated that the Purported ERGO Policy is a forgery, and Heilbronner Stimme reported that CFIUS contacted ERGO about the document. The €120 million proof of funds bore a signature reportedly copied from a Toronto lawyer.

185. Treasury attributed the misstatements to the foreign acquirer. Viston and the Offeror were the foreign acquirers in the Petroteq offer.

186. Treasury stated that CFIUS rejected the filing as a result of the misstatements and that the transaction was abandoned. CFIUS rejected the Petroteq notice on August 22, 2022, and the Offeror withdrew the offer on August 29, 2022.

187. A penalty imposed in 2024 is consistent with an investigation that followed an August 2022 rejection. Treasury's enforcement summaries include another 2024 penalty for violations that occurred in 2020 and 2021, showing that penalties can follow the underlying conduct by years.

188. The Petroteq offer matches each element of Treasury's description. On information and belief, the 2024 penalty concerned the Petroteq notice, and the foreign acquirer Treasury described is Viston and the Offeror.

## PLAINTIFF'S INVESTMENT

189. Plaintiff's permanent home was in Queens County, New York, throughout the relevant period. On information and belief, he was physically in New York when he placed the purchases.

190. Plaintiff's purchases are listed by date, quantity, and cost in Appendix A.

191. On information and belief, Plaintiff first heard about the Petroteq acquisition offer in or about early December 2021, and proceeded to read more about the deal.

192. Before his first January purchase, Plaintiff read the Offer Circular and its financing assurances. Based upon these assurances, Plaintiff began purchasing Petroteq stock.

193. In early February 2022, Plaintiff entered his information on PetroteqOffer.com in response to its invitation to report his tender status. He submitted his contact information through the website's form, and Kingsdale responded by email as described below.

194. On February 14, 2022, a "Senior Associate, Corporate Access" at Kingsdale Advisors, emailed Plaintiff in response to that submission. The associate asked which financial institution held his shares and how many he had tendered.

195. On February 23, Plaintiff responded to Kingsdale with the requested information.

196. As further tender materials and continued financing guarantees were filed with the SEC, Plaintiff read the newly published material generally within a week of publishing, and continued to rely on the materials as he made his additional purchases of shares.

197. Plaintiff tendered all his shares. The shares were returned when the offer was withdrawn.

**Actual Reliance**

198. Plaintiff relied on the original €420 million commitment in making his initial purchases. For later purchases, he relied on the Purported RBS Bank Advice and the subsequent loan and insurance representations, together with Petroteq's endorsement of them.

199. Had Plaintiff known that the financing evidence was materially false or misleading, he would not have made the affected purchases at the prices he paid.

200. The ability to pay the announced C$0.74 cash consideration was material to the investment decision. The loan commitment, asserted cash reservation, and Purported ERGO Policy gave investors apparent external support for that ability.

201. Petroteq's recommendation and accompanying financing representations added the target company's endorsement. Plaintiff actually relied on the statements he read before purchasing and, in the alternative, invokes the presumption of reliance set out below.

**Presumption of Reliance**

202. In addition to actual reliance, Plaintiff invokes the fraud-on-the-market presumption recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). The challenged financing representations were public and material.

203. Plaintiff purchased at market prices after the respective representations were disseminated and while, as alleged below, they continued to affect the prices of his shares.

204. On information and belief, the market for Petroteq common shares, including the United States PQEFF market in which Plaintiff purchased, efficiently incorporated material public information during the relevant purchase periods.

205. The Offeror, Viston, and Petroteq regularly published SEC filings, offer materials, and news releases available to investors in all countries. The price change and trading volume described below show a substantial response to news concerning the transaction.

206. The market for PQEFF reflected the material public financing information.

207. Plaintiff lacked knowledge of the concealed defects and purchased in reliance on the integrity of the market price.

208. Artificial inflation remained in PQEFF's price through Plaintiff's last purchase on August 19, 2022.

209. The alleged removal of inflation followed the August 24-29 announcements of the rejected notice, continuing proof-of-funds diligence, and withdrawal. The price declines and trading volumes accompanying those announcements are set out below.

**Plaintiff's Discovery of the Fraud**

210. Plaintiff first learned of the facts constituting the fraud in September 2026, when he, on happenstance, stumbled upon a webpage describing the anonymous 2024 CFIUS penalty.

211. Upon reading the description of the penalized transaction, Plaintiff was reminded of the collapsed Petroteq deal from several years prior and commenced further online research. Plaintiff was then able to discover the *Heilbronner Stimme* articles upon using more targeted search tools.

212. Every *Heilbronner Stimme* article cited in this complaint was in German and was available only to paying users. Plaintiff paid for access and used machine translation to read them.

213. Before September 2026, Plaintiff understood the withdrawal as the failure of an acquisition subject to regulatory conditions. He had not read the German reporting and did not know of ERGO's reported denial or the other evidence of falsification described above.

214. Plaintiff does not know German, and had no reason to believe that facts involving fraud in the acquisition of a Canadian corporation by a Swiss entity would be in a German newspaper.

215. The facts constituting the fraud did not appear in the sources available to a United States investor following the offer. No SEC filing by any defendant disclosed ERGO's reported denial.

216. The August 2022 announcements of the rejection and withdrawal did not state why CFIUS had rejected the notice, and they did not identify any forged document.

217. CFIUS did not make the reasons for its rejection public, as information filed with CFIUS is generally exempt from public disclosure under 50 U.S.C. § 4565(c).

218. Due to that confidentiality, Treasury's 2024 description of the $1.25 million CFIUS penalty also did not identify the parties or the transaction.

219. Through that review, Plaintiff first connected the financing assurances on which he had relied with the reported fabricated documents and the likely reason for CFIUS's rejection.

**<u>Scienter</u>**

*The Viston Defendants*

220. Roch was Viston's president and the Offeror's chief executive officer and sole director. He signed the financing documents and the certificates covering the offer disclosures, as alleged.

221. Roch signed the Viston Loan Agreement for Viston and as personal guarantor. He was a party to the commitment he presented to shareholders as unconditional.

222. Roch signed the Original Second Amendment twice, as Viston's director and as guarantor. It recited that Roch, as guarantor, and UNIExpress had put in place a surety insurance bond. The attached Purported ERGO Policy named Viston as policyholder of a €450 million policy, with a monthly premium of €2,400,000.

223. As Viston's director, Roch knew whether Viston had applied for that policy or agreed to pay that premium. ERGO reportedly stated that no such contractual relationship exists.

224. On July 21, 2022, Roch signed the Restated Second Amendment, which replaced the recital with an agreement to arrange insurance in the future. Viston did not disclose that ERGO had not issued the document already filed. In the same filing, Viston increased the purported loan commitment to €465 million.

225. The Fifth Extension Notice, which Roch certified, again repeated that the Purported ERGO Policy was intended to replace Roch's personal guarantee.

226. The Offer Circular stated that Viston had engaged Uppgard and supplied it with the €120 million confirmation. As Viston's president, Roch knew whether Viston had done so.

227. These facts support a strong inference that Roch knew the financing representations were false, or was at least consciously reckless as to their falsity.

228. Roch's knowledge is imputed to Viston and the Offeror, which acted through him.

229. Paul was the Offeror's chief financial officer. He certified the Offer Circular and the Second and Fifth Extension Notices, as alleged above.

230. The Offer Circular identified the UNIExpress facility as the source of funds for the offer. As chief financial officer, Paul was responsible for the Offeror's financing disclosures. Paul certified the Second and Fifth Extension Notices with at least conscious recklessness.

*The UNIExpress Defendants*

231. Vural signed the Viston Loan Agreement and both versions of the Second Amendment for UNIExpress, as alleged above. He signed the Original Second Amendment as UNIExpress's "Manager." Vural's knowledge is imputed to UNIExpress.

232. UNIExpress filed dormant-company accounts for each year in which it made or confirmed its financing commitments for the offer. As the signatory of those commitments, Vural knew whether UNIExpress had the funds it committed.

233. Vural's name appears as a signatory of the July 19, 2021 proof-of-funds letter, beside a signature attributed to "Michael Goetz" that was reportedly copied from a Toronto lawyer.

*The Petroteq Defendants*

234. Petroteq acted through its Board, including Podlipskiy. The knowledge of its directors and officers is imputed to Petroteq.

235. Petroteq stated that it had "no reason to doubt" the financing while disclosing that it could not verify the funding, as alleged above. Podlipskiy signed the certificate covering those statements.

236. Petroteq then republished UNIExpress's own confirmation of blocked funds, and Podlipskiy certified it after due inquiry, two days after Companies House recorded UNIExpress's dormant-company accounts and a strike-off notice. Petroteq had already stated that public information about UNIExpress raised questions about its access to funding.

237. Ten days after Petroteq's counsel raised questions about the Purported ERGO Policy, Podlipskiy and Hopkinson certified the July MD&A and July Financial Statements, and Podlipskiy and Dennewald signed the July Financial Statements.

238. The features of the Purported ERGO Policy described above appeared on its face. Hopkinson, as chief financial officer, and Dennewald, as an Audit Committee member, were responsible for reviewing the reports they certified or signed.

239. Podlipskiy, Hopkinson, and Dennewald each consciously disregarded these warning signs, as alleged above, when he endorsed the financing in the disclosures he signed or certified. Their conscious recklessness is imputed to Petroteq.

*Kingsdale Defendants*

240. As the named beneficiary of the Purported RBS Bank Advice, Kingsdale LP was positioned, on information and belief, to know whether any funds were reserved in its favor and when the reservation ended.

241. Kingsdale left that assurance on PetroteqOffer.com after the stated reservation had ended, as alleged above, and served as media contact on Viston's July 22, 2022 announcement. On information and belief, Kingsdale LP and Kingsdale US each knew, or consciously disregarded, that the financing assurances they disseminated were false or misleading.

**Loss Causation and Economic Loss**

242. On August 24, 2022, after the regular trading-session close, Viston and the Offeror announced, in a release filed August 25 as Exhibit (a)(5)(xvii) to the Tender Offer Statement, that CFIUS had rejected the joint voluntary notice. They said Treasury had communicated the rejection on August 22 and that they were evaluating its implications.

243. On August 25, Petroteq announced that its Board would evaluate whether the rejection, together with continuing diligence into Viston's proof of funds, warranted changing its support for the offer.

244. PQEFF fell from $0.2110 on August 24 to $0.1122 on August 25, a decline of approximately 46.8%, on volume of 13,813,205 shares.

245. The Offeror terminated the offer August 28 and announced withdrawal August 29 without purchasing any shares.

246. PQEFF closed at $0.0510 on August 30, about 75.8% below its August 24 close.

247. By September 30, it closed at $0.0340, about 83.9% below the August 24 close.

248. The loan commitment, asserted reservation of cash, and purported insurer support made the C$0.74 cash offer appear backed by genuine, committed financial resources.

249. These representations created or maintained artificial inflation in PQEFF's price by giving the acquisition an apparent financial credibility it lacked.

250. On information and belief, CFIUS rejected the joint notice because the financing submissions contained material misstatements, including forged documents and signatures.

251. The concealed risk was that the purported financing could not withstand regulatory scrutiny because its financial support had been misrepresented.

252. That risk materialized when CFIUS rejected the notice and the offer was withdrawn, removing the artificial inflation even though neither announcement stated the reason.

253. Plaintiff continued to hold the shares after they were returned to this day.

254. The failures of care and breaches of duty described below induced Plaintiff's purchases and exposed him to the concealed risk that the financial support was not genuine or available.

**Inapplicability of the Statutory Safe Harbor for Forward-Looking Statements**

255. The challenged representations concern existing commitments, cash reservations, and the source and authenticity of financing documents. They are statements of present or historical fact.

256. In addition, statements made in connection with the tender offer fall within the statutory safe-harbor exclusion in 15 U.S.C. § 78u-5(b)(2)(C).\

**Defendants' Undertakings and Duties to Plaintiff**

257. Each Defendant breached the duties described below by adopting materially inaccurate financing assurances without reasonable care. The fiduciaries also used their positions of trust to endorse those representations without addressing their reliability.

*Viston and UNIExpress Defendants*

258. The Viston Defendants and UNIExpress Defendants possessed specialized knowledge of the financing arrangements they represented or documented.

259. They supplied or adopted that information for use by Petroteq shareholders evaluating the acquisition.

260. These facts establish a special relationship imposing a duty to provide accurate information.

` *Petroteq Defendants*

261. Petroteq undertook to review the offer and communicate its recommendation and supporting financing information to shareholders, including Plaintiff.

262. By first directing shareholders to await its review and then recommending acceptance, Petroteq undertook to evaluate the offer and explain the financial basis of its recommendation.

263. The Board's statement that it had "no reason to doubt" the financing supplied an assurance. Petroteq and the individuals responsible for the recommendation materials owed Plaintiff reasonable care in undertaking that evaluation and communicating its results.

264. Reasonable care required Petroteq and its executives to address the reliability of the financing, including the unresolved funding questions and the changed insurance recital.

265. Petroteq and its executives breached that duty by continuing to endorse the financing without an adequate basis for its authenticity or financial support.

266. Podlipskiy, Hopkinson, and Dennewald personally participated through the recommendation materials, reports, signatures, and certifications attributed to each.

267. These undertakings and communications created duties owed directly to Plaintiff to exercise reasonable care in evaluating and conveying the financial information on which he relied.

268. Podlipskiy, Hopkinson, and Dennewald stood in a direct fiduciary relationship with Plaintiff concerning their evaluation and adoption of the offer's financing representations.

269. Within that relationship, each owed duties of loyalty, candor, and faithful performance of the responsibilities he undertook.

*Kingsdale Defendants*

270. Kingsdale LP and Kingsdale US each owed Plaintiff reasonable care in performing the shareholder services it undertook and in supplying the financing information used in those services.

271. Kingsdale LP learned Plaintiff's identity, broker, holdings, and tender status through the exchange alleged above. Its failure of care concerns the financing content it approved and disseminated in performing that shareholder outreach.

272. Kingsdale's direct dealings with Plaintiff, specialized role in shareholder services, and agency responsibilities concerning his tender also created fiduciary obligations within the scope of that relationship.

**COUNT I**
**Violation of Exchange Act § 10(b) and Rule 10b-5(b)**
**(Material Misstatements and Omissions)**
**Against the Offeror, Viston, Roch, Paul, UNIExpress, Vural, Petroteq, Podlipskiy, Hopkinson, and Dennewald**

273. Plaintiff incorporates paragraphs 1-272 herein.

274. This count concerns the materially false or misleading statements attributed to each defendant above, including the following:

275. The Offeror and Viston made the Offer Circular's agency and financing representations and the financing assurances in the Second Extension Notice and Fifth Extension Notice. Roch and Paul each certified all three for the Offeror, and Roch certified all three for Viston.

276. UNIExpress and Vural made the lender and insurance representations in the Viston Loan Agreement and its Original Second Amendment and Restated Second Amendment.

277. Petroteq published the Recommendation Supplement, Feb 10 Petroteq News Release, July MD&A, and July Financial Statements. Podlipskiy adopted the disclosures through the signatures and CEO Certification identified above.

278. Hopkinson adopted the July MD&A and July Financial Statements through the CFO Certification. Dennewald signed the July Financial Statements as a director.

279. Each acted knowingly or with conscious recklessness on the individual grounds alleged in the scienter section, using interstate communications in connection with Plaintiff's purchases.

280. Plaintiff actually relied on the statements he read before the affected purchases. Alternatively, he invokes the fraud-on-the-market presumption as alleged above.

281. The statements created or maintained artificial inflation in PQEFF's price and proximately caused his resulting investment losses.

**COUNT II**
**Violation of Exchange Act § 10(b) and Rule 10b-5(a) and (c)**
**(Fraudulent Scheme and Dissemination)**
**Against the Offeror, Viston, Roch, UNIExpress, Vural, Kingsdale LP, and Kingsdale US**

282. Plaintiff incorporates paragraphs 1-272 herein.

283. The Offeror, Viston, and Roch procured and used the purported third-party financing evidence to promote the cash offer.

284. UNIExpress supplied the lender and insurer instruments, while Vural executed the financing amendments.

285. The scheme used UNIExpress's sham banking identity and the falsely attributed Purported ERGO Policy to give fabricated financing apparent independent support.

286. On information and belief, Kingsdale LP and Kingsdale US each approved and disseminated the deceptive materials through the offer website and shareholder campaign to induce purchases and tenders.

287. Each Defendant acted knowingly or with conscious recklessness, using interstate communications in connection with Plaintiff's purchases.

288. Plaintiff actually relied on the materials he read and alternatively invokes the fraud-on-the-market presumption as alleged above.

289. The deceptive conduct created or maintained artificial inflation and proximately caused the investment losses described above.

**COUNT III**
**Violation of Exchange Act § 18(a)**
**(False and Misleading Statements in Filed Documents)**
**Against the Offeror, Viston, Roch, Paul, UNIExpress, Vural, Petroteq, Podlipskiy, Kingsdale LP, and Kingsdale US**

290. Plaintiff incorporates paragraphs 1-272 herein.

291. Each document identified below was filed with the SEC under the Exchange Act and contained statements that were false or misleading with respect to material facts, as alleged above.

292. *Tender offer filings*. The Offer Circular, the Second Extension Notice, and the Fifth Extension Notice contained the financing statements alleged above. The Offeror and Viston made those statements. Roch and Paul certified each document for the Offeror, and Roch certified each for Viston.

293. *Website and outreach exhibits*. The PetroteqOffer.com materials filed as Exhibits (a)(5)(ii) and (a)(5)(iii), and the Shareholder Outreach Material filed as Exhibits (g)(1) and (a)(5)(v), repeated the firm-financing assurances. The Offeror and Viston made those statements, and Roch signed the filings that contained them. On information and belief, Kingsdale LP and Kingsdale US supplied the financing content of those exhibits and caused its inclusion.

294. *Financing agreements*. The Viston Loan Agreement (Exhibit (b)(1)), the Original Second Amendment (Exhibit (b)(3)), and the Restated Second Amendment (Exhibit (b)(5)) contained UNIExpress's lender and insurance representations. UNIExpress made those representations, and Vural signed each agreement on its behalf.

295. *Petroteq filings*. The Feb 10 Petroteq News Release, filed as Exhibit (a)(5)(C) to the Petroteq Recommendation Statement, contained the Purported RBS Bank Advice representations. Petroteq made those statements, and Podlipskiy certified the filing as true after due inquiry.

296. Before each affected purchase, Plaintiff read and relied on the filed statements identified above. He did not know they were false or misleading.

297. No defendant acted in good faith or without knowledge that the statements were false or misleading.

298. Plaintiff purchased PQEFF at prices affected by those statements and suffered the losses described above.

## **COUNT IV**
## **Violation of Exchange Act § 14(e)**
## **(Misleading Tender Solicitation and Recommendation)**
**Against the Offeror, Viston, Roch, Paul, UNIExpress, Vural, Petroteq, Podlipskiy, Hopkinson, Dennewald, Kingsdale LP, and Kingsdale US**

299. Plaintiff incorporates paragraphs 1-272 herein.

300. This count concerns each defendant's own materially misleading solicitation, recommendation disclosures, or deceptive acts in connection with the tender offer, as specifically attributed above.

301. Petroteq's July reports presented the Purported ERGO Policy as genuine insurer support for the financing. This disclosure violation is asserted against Petroteq and the executives who adopted the respective reports.

302. Each defendant knew or consciously disregarded the material falsity attributable to that defendant, on the individual grounds alleged in the scienter section. The financing representations were material to the credibility of the cash offer and the decision whether to tender.

303. Plaintiff read and actually relied on the representations in purchasing and tendering his shares. The offer was withdrawn without purchasing them. Each defendant's violation proximately caused the attributable investment losses described above.

**COUNT V**
**Violation of Exchange Act § 9(a)(4), enforceable under § 9(f)**
**(Misstatements to Induce Securities Transactions)**
**Against the Offeror, Viston, Roch, Paul, UNIExpress, Vural, Kingsdale LP, and Kingsdale US**

304. Plaintiff incorporates paragraphs 1-272 herein.

305. The Offeror and Viston offered to purchase Petroteq shares and made the challenged financing statements to induce purchases and tenders, knowing or having reasonable grounds to believe those statements were materially false or misleading.

306. Roch and Paul willfully participated through the instruments or disclosures each adopted.

307. UNIExpress and Vural willfully participated by supplying the purported lender and insurer support.

308. Kingsdale LP and Kingsdale US each willfully participated by approving and disseminating the false assurances to induce securities transactions.

309. The statements affected PQEFF's price. Plaintiff purchased at affected prices and suffered the resulting losses described above. Each defendant is liable under § 9(f) for its own willful participation in the § 9(a)(4) violation.

**COUNT VI**
**Violation of Exchange Act § 20(a)**
**(Control Person Liability)**
**Against Viston, Roch, Vural, Paul, Podlipskiy, Hopkinson, and Dennewald**

310. Plaintiff incorporates paragraphs 1-272 herein.

311. The primary violations are those of the Offeror, Viston, and UNIExpress alleged in Counts I through V; and Petroteq's violations alleged in Counts I, III, and IV.

312. Viston controlled the Offeror through ownership and management of the acquisition.

313. Roch controlled the Offeror as its sole director and CEO and directed Viston's acquisition and financing as its president.

314. Roch's culpable participation included signing the Tender Offer Statement amendment that filed the Original Second Amendment with the Purported ERGO Policy attached, and certifying the Fifth Extension Notice's statement that the document originated with UNIExpress's insurer.

315. Paul, as the Offeror's chief financial officer, certified the Offer Circular and the Second and Fifth Extension Notices. His review and certification responsibilities gave him authority to approve or require correction of the Offeror's financing disclosures.

316. Podlipskiy, as a Petroteq director and later its interim chief executive officer, signed the Board's certificates on the recommendation materials and the CEO Certification. He had

authority to approve or require correction of Petroteq's recommendation and financing disclosures during his tenure.

317. Hopkinson, as Petroteq's chief financial officer and a director from January 24, 2022, signed the CFO Certification. He exercised authority over Petroteq's review and approval of the financial reports he certified.

318. Dennewald, as a Petroteq director and Audit Committee member, signed the July Financial Statements. He had authority to approve or require correction of the financial statements he signed.

319. Each defendant culpably participated by approving or certifying misleading disclosures with the knowledge or conscious recklessness alleged for him above.

320. On information and belief, Vural controlled UNIExpress's participation in the financing amendments and directed the lender statements supplied for the tender filings.

321. Vural's culpable participation consisted of executing and adopting the false insurer representations with the knowledge alleged above.

322. Each defendant is liable under § 20(a) for the specified primary violations of the entity it controlled and the resulting losses.

**COUNT VII**
**Common-law Fraud**
**(Fraudulent Inducement to Purchase Securities)**
**Against the Offeror, Viston, Roch, Paul, UNIExpress, Vural, Petroteq, Podlipskiy, Hopkinson, Dennewald, Kingsdale LP, and Kingsdale US**

323. Plaintiff incorporates paragraphs 1-272 herein.

324. Each defendant made or conveyed the materially false financing representations attributed to that defendant above.

325. The financing representations falsely presented UNIExpress as a genuine institution capable of supplying the committed funds.

326. On information and belief, Kingsdale LP and Kingsdale US each approved and conveyed the challenged assurances through the website and shareholder solicitation.

327. Each defendant knew its representations were false or recklessly disregarded their truth and intended to induce reliance, including purchases of shares, on the individual grounds alleged above.

328. Plaintiff reasonably and actually relied on the representations he read before the affected purchases. He did not know they were false and would not have purchased at the prices paid had the truth been disclosed.

329. The fraud proximately caused his out-of-pocket investment losses described above.

**COUNT VIII**
**Common-law Aiding and Abetting Fraud**
**(Knowing and Substantial Assistance in Fraud)**
**Against Kingsdale LP and Kingsdale US**

330. Plaintiff incorporates paragraphs 1-272 herein.

331. The underlying fraud is the false financing representations and use of purported third-party financing documents by the Offeror, Viston, Roch, Paul, UNIExpress, and Vural, as alleged in Count VII.

332. This claim is alternative to Kingsdale's direct fraud liability.

333. On information and belief, Kingsdale LP and Kingsdale US each actually knew of that fraud and substantially assisted it by approving and disseminating the false assurances through the website and shareholder campaign, with Kingsdale US participating in communications to United States holders.

334. Plaintiff relied on those materials in making the subsequent purchases described above. Each entity's knowing assistance was a substantial factor in proximately causing his attributable investment losses.

**COUNT IX**
**Common-law Negligent Misrepresentation**
**Against the Offeror, Viston, Roch, Paul, UNIExpress, Vural, Petroteq, Podlipskiy, Hopkinson, Dennewald, Kingsdale LP, and Kingsdale US**

335. Plaintiff incorporates paragraphs 1-272 herein.

336. Each defendant owed Plaintiff a duty to provide accurate information with reasonable care within the special relationship and undertakings alleged above.

337. Each supplied or adopted the materially inaccurate financing information specifically attributed to that defendant for shareholder reliance.

338. Alternatively to fraud, each failed to exercise reasonable care in determining that information's accuracy.

339. Plaintiff actually and reasonably relied on it before the affected purchases. The resulting exposure to the concealed financing risk proximately caused his attributable out-of-pocket losses.

**COUNT X**
**Common-law Ordinary Negligence**
**Against Petroteq, Podlipskiy, Hopkinson, Dennewald, Kingsdale LP, and Kingsdale US**

340. Plaintiff incorporates paragraphs 1-272 herein.

341. This claim is alternative to knowing or reckless misconduct.

342. The Petroteq Defendants owed Plaintiff reasonable care within their respective offer-evaluation and disclosure undertakings.

343. Kingsdale LP and Kingsdale US each owed reasonable care within the shareholder services it undertook. The particular relationships and scope of each defendant's duties are alleged above.

344. Each breached those duties by failing to exercise reasonable care concerning the reliability of the purported financing arrangement, including in responding to the identified document defects and unresolved questions.

345. Those failures induced Plaintiff's affected purchases in reliance on those financing representations and proximately caused his attributable investment losses.

**COUNT XI**
**Common-law Breach of Fiduciary Duty**
**Against Podlipskiy, Hopkinson, Dennewald, Kingsdale LP, and Kingsdale US**

346. Plaintiff incorporates paragraphs 1-272 herein.

347. Podlipskiy, Hopkinson, and Dennewald owed Plaintiff direct fiduciary duties of loyalty, candor, and faithful performance within their respective transaction-specific relationships alleged above, under the applicable common law.

348. Kingsdale LP owed corresponding duties within its agency and shareholder-services relationship with Plaintiff. Kingsdale US owed those duties to the extent it undertook that relationship and performed the services alleged above.

349. Each breached those duties by using the relationship's authority or trust to promote the misleading financing representations without candidly addressing the defects and unresolved questions attributable to that defendant.

350. The breaches induced Plaintiff's purchases and proximately caused his investment losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment:

A. Awarding compensatory and punitive damages against the defendants liable under each count, in the amount of the loss caused by their respective violations, to be proved at trial;

B. Imposing joint and several liability where authorized by the applicable statute or common law, and proportionate liability where required;

C. Awarding prejudgment and postjudgment interest as permitted by law;

D. Awarding recoverable costs and any attorneys' fees for which a statutory or other legal basis exists; and

E. Granting such further relief as the Court considers proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues triable by jury.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED: October 22, 2026

**By: HYUNSEOUNG CHOI**
**Plaintiff, *pro se***
43-10 Crescent St. Apt. 2705
Long Island City, NY 11101 (USA)
hschoi9898@gmail.com
(401) 484-8243

# APPENDIX A

Plaintiff purchased 425,827 shares of PQEFF as follows. Amounts are in United States dollars.

| Lot | Acquisition date | Shares | Cost basis | Price per share |
|---|---|---|---|---|
| 1 | 01/06/2022 | 10,000 | $3,766.95 | $0.3767 |
| 2 | 02/01/2022 | 15,000 | $4,755.95 | $0.3171 |
| 3 | 02/23/2022 | 20,000 | $7,204.89 | $0.3602 |
| 4 | 02/23/2022 | 8,430 | $3,036.86 | $0.3602 |
| 5 | 04/11/2022 | 32,500 | $12,258.95 | $0.3772 |
| 6 | 04/11/2022 | 29,500 | $11,069.88 | $0.3753 |
| 7 | 04/11/2022 | 2,500 | $943.00 | $0.3772 |
| 8 | 04/13/2022 | 69,570 | $25,991.35 | $0.3736 |
| 9 | 04/13/2022 | 2,500 | $933.20 | $0.3733 |
| 10 | 06/10/2022 | 24,400 | $5,448.15 | $0.2233 |
| 11 | 06/10/2022 | 22,500 | $4,955.76 | $0.2203 |
| 12 | 06/10/2022 | 4,629 | $1,019.57 | $0.2203 |
| 13 | 06/29/2022 | 15,500 | $3,072.94 | $0.1983 |
| 14 | 06/29/2022 | 10,000 | $1,978.54 | $0.1979 |
| 15 | 06/29/2022 | 10,000 | $1,978.54 | $0.1979 |
| 16 | 06/29/2022 | 9,500 | $1,900.53 | $0.2001 |
| 17 | 07/06/2022 | 39,900 | $7,892.02 | $0.1978 |
| 18 | 07/07/2022 | 25,000 | $5,006.79 | $0.2003 |
| 19 | 07/07/2022 | 600 | $120.16 | $0.2003 |
| 20 | 07/20/2022 | 521 | $109.95 | $0.2110 |
| 21 | 07/28/2022 | 20,360 | $2,999.87 | $0.1473 |
| 22 | 08/11/2022 | 10,000 | $2,348.67 | $0.2349 |
| 23 | 08/11/2022 | 8,221 | $1,897.78 | $0.2308 |
| 24 | 08/11/2022 | 7,000 | $1,608.72 | $0.2298 |
| 25 | 08/11/2022 | 500 | $114.91 | $0.2298 |
| 26 | 08/11/2022 | 500 | $114.91 | $0.2298 |
| 27 | 08/11/2022 | 500 | $114.91 | $0.2298 |
| 28 | 08/11/2022 | 412 | $96.77 | $0.2349 |
| 29 | 08/19/2022 | 17,235 | $3,746.95 | $0.2174 |
| 30 | 08/19/2022 | 5,000 | $1,079.06 | $0.2158 |
| 31 | 08/19/2022 | 2,500 | $537.03 | $0.2148 |
| 32 | 08/19/2022 | 500 | $107.41 | $0.2148 |
| 33 | 08/19/2022 | 500 | $107.41 | $0.2148 |
| 34 | 08/19/2022 | 49 | $10.53 | $0.2149 |